**NOT FOR PUBLICATION**                                 **CASE CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH VARNEY, | Civil Action No. 07-CV-47(SDW) |
| Plaintiff, | |
| v. | |
| BJ'S WHOLESALE CLUB, INC., JOHN DOES 1-10 | **OPINION** |
| Defendants. | July 30, 2008 |

**WIGENTON,** District Judge.

Before this Court is Defendant BJ's Wholesale Club, Inc.'s ("BJ" or "Defendant") and Plaintiff, Joseph Varney's, ("Varney" or "Plaintiff") Cross Motions for Summary Judgment pursuant to Fed. R. Civ. P. 56(c). The Court, having considered the parties' submissions and having decided the motions without oral argument pursuant to Fed. R. Civ. P. 78, and for the reasons set forth below, **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion as moot.

### I. JURISDICTION AND VENUE

This Court has original jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331and 1343, and pendent jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(a).

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 24, 1992, Varney signed and completed a job application to work at BJ's. (Def.'s

Statement of Material Facts at ¶ 1.) Plaintiff understood from BJ's job application that he could be fired at any time and his employment was for not any specific duration as he was an "at-will" employee. (Def.'s Statement of Material Facts at ¶¶ 3-4.) Plaintiff also received a copy of BJ's Club Team Member Guide ("Handbook") upon being hired. (Def.'s Statement of Material Facts at ¶ 5.) The Handbook contained a clause that made it explicitly clear that, "this guide does not constitute an employment contract . . . . or otherwise modify the at-will nature of our Team Members' relationship with the company." (Def.'s Statement of Material Facts at ¶ 8; Hicks Cert. at Ex. B, Team Member Guide, p. 7.)

Defendant initially hired Plaintiff as a ticketer. (Def.'s Statement of Material Facts at 12.) On or about November 1997, Plaintiff was promoted to Night Merchandise Assistant at the East Rutherford, New Jersey location. (Def.'s Statement of Material Facts at ¶ 13.) On May 12, 1998, Plaintiff received his first performance appraisal from Defendant. (Hicks Cert. at Ex. C, 1998 Performance Appraisal.) Plaintiff received a rating of 57 out of 100, which is considered a "Good" rating. *Id.* However, Plaintiff received a "Needs Improvement" rating in the leadership category, with specific comments provided to Plaintiff regarding his performance. *Id.* On May 15, 1999, Plaintiff received his second performance evaluation as Night Merchandise Assistant. (Hicks Cert. at Ex. D, 1999 Performance Appraisal.) He received a score of 71 out of a possible 100, which is considered a "Very Good" rating. *Id.* Plaintiff's manager, nonetheless, still reiterated several concerns with Plaintiff's lack of leadership and ability to effectively communicate with other employees. *Id.* On June 20, 1999, Plaintiff was promoted again to Senior Overnight Manager. (Hicks Cert. at ¶ 3.) He was subsequently transferred in November 1999 to the Linden, New Jersey location. *Id.* On May 19, 2000, Plaintiff received his performance appraisal as a Senior Overnight

Manager and received a score of 68 out of a possible 100, which is considered a "Good" rating. (Hicks Cert. at Ex. E, 2000 Performance Appraisal.) Plaintiff again received a "Needs Improvement" score in the areas of "Job Responsibility" and "Leadership," while receiving specific comments regarding his performance from General Manager ("GM") Michele Rossi. *Id.*

On April 30, 2000, Plaintiff was transferred to the Paramus, New Jersey location. (Hicks Cert. at ¶ 4.) On May 21, 2001, Plaintiff received his performance appraisal from GM Joanne Kurz, who gave Plaintiff a rating of 61 out of 100. (Hicks Cert. at Ex. F, 2001 Performance Appraisal.) Although Plaintiff received a score of 61 out of 100, which is considered a "Good" rating, his supervisor voiced several specific concerns regarding his performance. *Id.* On May 22, 2002, Plaintiff received another performance appraisal from GM Joanne Kurz. (Hicks Cert. at Ex. G, 2002 Performance Appraisal.) Plaintiff received a score of 53 out of 100, which is considered a "Good" rating. *Id.* Plaintiff, however, received a score of 0 out of a possible 25 in the leadership category, for an "Unacceptable" rating, as well as specific criticism regarding his performance from GM Joanne Kurz. *Id.* On July 14, 2002, Plaintiff was transferred to the Jersey City, New Jersey location. (Hicks Cert. at ¶ 5.) On May 8, 2003 Plaintiff received another performance appraisal from GM Alan Martin, who gave Plaintiff 60 out of a possible 100. (Hicks Cert. at Ex. H, 2003 Performance Appraisal.) Plaintiff received a "Good" rating based on his score of 60, but GM Alan Martin provided specific criticism and areas where Plaintiff could improve. *Id.* In April 2004, Plaintiff was transferred to the West Nyack, New York location. (Hicks Cert. at ¶ 6.) On May 20, 2004, Plaintiff received his performance appraisal from GM Frank Varela who gave Plaintiff a "Good" rating, despite noted deficiencies regarding his work. (Hicks Cert. at Ex. I, 2004 Performance Appraisal.) Post-performance appraisal, Plaintiff was instructed by Varela to complete a BJ's on-line course by

July 15 on "Setting Goals and Prioritizing Use of Time." *Id.* Plaintiff never took the required on-line learning course. (Anders Cert. at Ex. A, Varney Dep. at 298:21-299:11.)

On September 6, 2004, Plaintiff was issued a performance warning from Varela, wherein he reminded Plaintiff of certain specific performance issues they had discussed on previous occasions. (Hicks Cert. at Ex. J.) Varela informed Plaintiff that if he did not improve his overall performance, he may be subject to further disciplinary action and possibly employment termination. *Id.* On May 27, 2005, Plaintiff was issued another performance appraisal, wherein he received a "Good" rating, but Varela indicated there were still deficient performance areas. (Hicks Cert. at Ex. K, 2005 Performance Appraisal.) On June 16, 2005, Varela issued and Plaintiff signed a verbal corrective action due to Plaintiff's failure to comply with Defendant's "available for sale" ("AFS") program.[1] (Hicks Cert. at Ex. L, June 16, 2005 Memorandum.) On July 26, 2005, Plaintiff received a second verbal corrective warning, but Plaintiff refused to sign the warning. (Hicks Cert. at Ex. M, July 26, 2005 Memorandum.) Plaintiff was warned that additional violations may lead to further disciplinary action, including possible dismissal. *Id.* On May 19, 2006, Plaintiff received his annual performance evaluation. (Hicks Cert. at Ex. O, 2006 Performance Appraisal.) Plaintiff informed Assistant Vice President Regional Manager Bob Fishbein ("Fishbein") that his commute to West Nyack was "getting to him." (Fishbein Dep. at 26:2-7.) Although Defendant's general company policy is to prohibit transfers or promotions of employees who receive a "Good" rating or less on their performance appraisals, after consulting with Zone Vice President Tom Gallagher, Fishbein approved Plaintiff's transfer. (Fishbein Dep. at 30:2-23; 31:14-32:6.)

---

[1] This term refers to specific reports that reflect product quantities on the sales floor. (Def.'s Mat. Statement of Facts at ¶ 59.)

4

On June 4, 2006, Plaintiff was transferred to the Jersey City, New Jersey location and placed on a ninety-day probationary period. (Hicks Cert. at ¶¶ 8, 68, 77-78.) On June 6, 2006, GM Raghib noted that Plaintiff failed to complete certain assigned tasks. (Hicks Cert. at Ex. Q, June 6, 2006 Memorandum.) On June 12, 2006, GM Raghib issued Plaintiff a written memorandum that detailed his "poor management skills," which Plaintiff refused to sign. (Hicks Cert. at Ex. R, June 12, 2006 Memorandum.) On July 31, 2006, GM Raghib issued Plaintiff a written corrective that detailed several areas Plaintiff needed to improve to successfully complete his probationary period. (Hicks Cert. at Ex. S, July 31, 2006 Memorandum.) Plaintiff was warned that if he did not take steps to correct these issues, further disciplinary action would result. *Id.* On August 30, 2006, Plaintiff was terminated at the conclusion of his ninety-day probationary period for failure to correct the recurring performance issues noted by his GMs over the course of his tenure as Defendant's employee. (Hicks Cert. at Ex. T, Termination Notice.)

## III.   LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002). It is on this standard that the Court adjudicates the pending summary judgment motions.

## IV. DISCUSSION

### A. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### 1. *COUNT ONE - Plaintiff's Age/Race Discrimination Claim*

Plaintiff brings this discrimination action pursuant to New Jersey's Law Against Discrimination ("NJLAD"). See N.J. Stat. Ann. 10:5-1 et seq. To sustain a discrimination claim, New Jersey has adopted the procedural burden-shifting methodology articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Zive v. Stanley Roberts Inc., 182 N.J. 436, 447 (2005). The McDonnell Douglas framework consists of three prongs. First, the plaintiff must establish a *prima facie* case of discrimination. Then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Finally, the burden shifts back

to the plaintiff to produce evidence that shows that the employer's proffered reason is pretextual. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Under NJLAD, a plaintiff terminated from employment must establish a *prima facie* discrimination case by showing that: (1) he was in a protected group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) the employer sought someone to perform the same work after he left. Fischer v. Allied Signal Corp., 974 F.Supp. 797, 805 (D.N.J. 1997) (citation omitted). In the instant matter, Plaintiff was in a protected group, qualified for his former position and performing at a level that met his former employer's legitimate expectations, subsequently terminated from his position, and Defendant did fill his position post termination. As such, Plaintiff has met his initial burden of demonstrating *prima facie* discrimination. Therefore, the Court will now turn to the second prong of the McDonnell Douglas framework.

Under the second prong of the McDonnell Douglas analysis, the burden of production, but not the burden of persuasion, shifts to the defendant, who must proffer legitimate, nondiscriminatory reasons for discharging the employee. In the matter at bar, Defendant has set forth three distinct nondiscriminatory reasons for terminating Plaintiff: (1) Plaintiff failed to address performance deficiencies that arose during the course of his employment as a manager; (2) Plaintiff's refusal to adequately address his performance deficiencies resulted in numerous corrective actions and the imposition of a probationary review period in accordance with company policy; and (3) Plaintiff was terminated at the end of his probationary period for failure to improve his performance. (Def. Br. at 5.) As Defendant has provided three apparently legitimate nondiscriminatory reasons for terminating Plaintiff's employment, the burden of persuasion and production shift back onto Plaintiff

7

to adduce evidence that Defendant's proffered reasons are pretextual.

In the third stage of the McDonnell Douglas framework, Plaintiff must "*either* (I) discredit the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, [to show] that [the] discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 764 (emphasis in original). Plaintiff need not produce additional discrimination evidence beyond his *prima facie* case if he can point to evidence that sufficiently discredits Defendant's proffered reasons. Id. Additionally, Plaintiff need not directly contradict Defendant's promulgated reasons. Id. To avoid summary judgment, a "plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." Id. (citations omitted.) It is not always necessary for a plaintiff to cast substantial doubt on each of a defendant's proffered reasons individually. If an employer proffers a number of reasons, and "the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Fuentes, 32 F.3d at 764 n.7.

As relates to the instant matter, if Plaintiff successfully casts doubt on some of Defendant's proffered reasons, he may not need to do so for all of them. This Court will now examine each of the Defendant's proffered reasons separately to determine if Plaintiff has "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,'" either in their totality or individually. Id. at 765.

### a. Plaintiff failed to address his performance deficiencies while Defendant's employee

Plaintiff received numerous annual performance appraisals from Defendant. As part of these annual performance appraisals, Plaintiff was given an overall numerical rating out of 100 points along with criticism and suggestions for areas that needed improvement. Plaintiff's first appraisal in 1998 indicated that he was having difficulty with planning, organization, consistency, leadership responsibilities, and interactions with coworkers and subordinates. (Def.'s Statement of Material Facts at ¶ 17.) Despite receiving a higher numerical rating on his second annual performance appraisal, Plaintiff was told that he needed improvement in the job responsibility and leadership areas. *Id.* at ¶ 24. After Plaintiff transferred to the Paramus, New Jersey location on April 30, 2000, he received a "Good" rating on his annual performance appraisal from his GM Joanne Kurz, despite her noting that she had concerns about Plaintiff's lack of effective communication and leadership skills. *Id.* at ¶ 30. In Plaintiff's 2002 annual performance appraisal, along with his diminishing numerical scores, he received a 0 out of a possible 25 points in the leadership category. *Id.* at ¶ 33. GM Kurz specifically noted that Plaintiff needed improvement in the following areas: (1) zero sales,[2] (2) mandatory endcap,[3] (3) cleanliness and sanitation, (4) signage, (5) shrinkage,[4] and (6) organization and store presentation. *Id.* at ¶¶ 34-35. When Plaintiff began working for GM Alan Martin after transferring to the Jersey City, New Jersey location on July 14, 2002, GM Martin expressed similar concerns as Plaintiff's previous GM's regarding his lack of leadership skills, and

---

[2]This term refers to a process for reporting and displaying items that are not being adequately sold. *Id.* at ¶ 25.

[3]This term refers to product displays located at the end of an aisle. There are specific BJ's guidelines for endcap placement. *Id.* at ¶ 34, fn. 3.

[4]This term refers to product loss. *Id.* at ¶ 35.

inability to effectively communicate with subordinate employees. *Id.* at ¶¶ 36, 38. In April 2004, when Plaintiff was transferred again to the West Nyack, New York location working under GM Frank Varela, he noted that Plaintiff's performance regarding his core job responsibilities was satisfactory, but noted that he had safety, sanitation, and signage issues. *Id.* at ¶¶ 39-42. Varela also required Plaintiff to take an on-line course to help improve managerial, computer and job skills - yet he refused to do so. *Id.* at ¶¶ 44-45. Despite Plaintiff receiving a multitude of tenuous annual performance appraisals from 1998 until his termination, he never addressed any of Defendant's repeated employment concerns or negative performance commentary. Defendant's concerns about Plaintiff's lack of communication, consistency in the workplace, and leadership skills were a constant source of contention. Rather than providing specific examples to show that his termination was the result of racial or age animus, Plaintiff instead challenges the scope of his job responsibilities. Plaintiff remarked at his deposition, "[T]he garbage and to sweep, you know, we had people to sweep although I am a manager I oversaw it. But I don't think that it was solely my responsibility to see that all of these things be done." (Varney Dep. at 23:19-24:3.) Plaintiff's deposition is replete with challenges to Defendant's business judgment rather than demonstrating a discriminatory pretext, which is improper as a matter of law. *See, e.g. Fuentes* 32 F.3d at 765; *Kautz*, 412 F.3d at 467; *Keller*, 130 F.3d at 1109; *Kelly*, 94 F.3d at 109.

### b. Plaintiff's refusal to adequately address his performance deficiencies resulted in numerous corrective actions

BJ's disciplinary policy is succinctly set forth in its Handbook. (Def.'s Statement of Material Facts at ¶ 10.) There are four different disciplinary actions that can be taken depending on the severity of the violation: (1) verbal corrective; (2) written corrective; (3) final written corrective; and

(4) employment termination. *Id.* at ¶ 11. Plaintiff was issued a verbal corrective warning for failing to adhere to BJ's AFS policy on June 16, 2005, which he signed. *Id.* at ¶¶ 59-60. Plaintiff was issued a second unspecified corrective warning for failing to complete assigned tasks that were related to his failure to comply with BJ's policies, which he refused to sign. *Id.* at ¶¶ 61-63. On November 18, 2005, GM Varela issued Plaintiff a written corrective warning for failure to perform specific job responsibilities. *Id.* at ¶¶ 64-67. In less than a six month time span, Plaintiff received three corrective warnings. Plaintiff has not addressed any of the referenced corrective warnings other than to state that they were sporadically disseminated and that he received no additional warnings after November 18, 2005. (Pl.'s Br. in Opp'n at 6.) Plaintiff has offered no facts or evidence to show that Defendant's legitimate articulated nondiscriminatory reasons were a pretext for racial or age discrimination. *See Maldonado v. Ramirez* 757 F.2d 48, 51 (3d Cir. 1985) (holding that facts, "rather than [mere] opinions or conclusions," are required in opposition to a motion for summary judgment). As Plaintiff has failed to make the requisite showing that BJ's proffered termination reasons are an actionable NJLAD pretext, his NJLAD discrimination claim is subject to dismissal on summary judgment as a matter of law.

### c. Plaintiff failed to improve his performance during his 90-day probationary period

Pursuant to company policy, upon receiving a "Needs Improvement" rating in his May 19, 2006[5] final performance appraisal, Plaintiff was placed on a ninety-day probationary period and subsequently transferred back to the Jersey City, New Jersey location on June 4, 2006. (Def.'s Material Statement of Facts at ¶¶ 68, 77-78.) On June 6, 2006, Plaintiff was informed in writing that

---

[5]The Court takes notice that Fishbein prepared Plaintiff's final performance appraisal based on personal knowledge of Plaintiff's performance from his prior interactions with Plaintiff at the West Nyack, New York location, and the complaints he received from GM Varela. (Def.'s Material Statement of Facts at ¶¶ 69-70.)

he failed to complete certain assigned tasks. *Id.* at ¶ 94. On June 12, 2006, GM Raghib warned Plaintiff again that his lackluster performance required improvement, especially as to his "poor management skills." *Id.* at ¶ 98. GM Raghib echoed Plaintiff's past GM's pervasive concerns regarding signage, AFS, zero sales, and unsafe pallets. *Id.* at ¶¶ 109-111. On one specific occasion, Zone Vice President Tom Gallagher requested Plaintiff reset a merchandise aisle. *Id.* at ¶ 117. Plaintiff, however, failed to perform the task, requiring other employees to complete Plaintiff's assigned task. *Id.* at ¶ 117. On August 12, 2006, GM Raghib reviewed Plaintiff's performance issues with Plaintiff and noted that they had previously discussed the issues, especially as to product recovery and signage. *Id.* at ¶ 120. On August 28, 2006, GM Raghib indicated that he still had several unresolved performance issues with Plaintiff related to signage, resets, endcaps, safety and organization. *Id.* at 122. As a result, Fishbein, Gallagher, Hicks, and Raghib discussed and collectively determined at the conclusion of Plaintiff's ninety-day probationary period that he failed to improve his performance deficiencies. *Id.* at ¶ 123. Thereafter, Plaintiff was terminated on August 30, 2006. *Id.* at ¶ 124.

Rather than alleging a discriminatory pretext, Plaintiff has merely challenged Defendant's proffered termination reasons. Plaintiff is thus unable to satisfy his pretext burden by merely questioning Defendant's employment termination decision. *Fuentes*, 32 F.3d at 765 (holding that "pretext is not shown by evidence that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.") Since Plaintiff has failed to present any evidence (other than mere allegation) to support his discrimination claim, or to demonstrate a discriminatory animus, Defendants are granted summary judgment on Plaintiff's NJLAD claim.

### 2. *COUNT TWO - Plaintiff's Breach of Contract Claim*

Plaintiff's breach of contract claim is also deemed abandoned by this Court as Plaintiff has failed to contest any of Defendant's proffered arguments in opposition to his claim. Therefore, Defendant's oppositional arguments are deemed admitted as unopposed on motion. Additionally, the Court's own independent analysis of the motion record yields no finding to the contrary or any inaccuracies in Defendant's proofs or proffered arguments. *See Desyatnik v. Atl. Casting & Eng'g Corp.*, 2006 U.S. Dist. LEXIS 1335, *1 (D.N.J. Jan. 12, 2006) (ruling that where the non-movant fails to challenge the moving party's argument on summary judgment, said claim is deemed abandoned). Ultimately, this Court is left with no recourse other than to credit Defendant's arguments and grant summary judgment.

## V. CONCLUSION

For all the above reasons, and in accordance with Fed. R. Civ. P. 56(c), this Court will **GRANT** Defendant's Summary Judgment Motion, and **DENY** Plaintiff's Summary Judgment Cross Motion as moot. Plaintiff's Complaint is **DISMISSED** in its entirety. The Clerk of the Court shall remove this case from the Court's active docket.

**SO ORDERED.**

s/Susan D. Wigenton, U.S.D.J.

cc: Madeline Cox Arleo, U.S.M.J.